# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 14, 2013

No. 11-70028

Lyle W. Cayce
Clerk

WILLIE TYRONE TROTTIE,

Petitioner - Appellant,

v.

WILLIAM STEPHENS, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent - Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, DAVIS, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

In 1993, a Texas jury sentenced Willie Tyrone Trottie to death for the murders of Barbara and Titus Canada. Trottie filed a federal habeas petition pursuant to 28 U.S.C. § 2254, asserting *Strickland* ineffective-assistance-of-counsel claims, *Brady* suppression-of-evidence claims, and prosecutorial-misconduct claims. After careful review, the district court denied the petition. Trottie now seeks a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c)(2). For the reasons that follow, we deny Trottie's COA application.

No. 11-70028

## FACTUAL BACKGROUND

Trottie and Barbara Canada met and began dating in about 1989. Shortly thereafter, the two moved in together and had a child. In September 1992, the couple separated and Barbara moved in with her family.

Trottie's behavior towards Barbara became increasingly violent following their 1992 separation. According to state witnesses that testified at Trottie's trial, Trottie warned Barbara that he would kill her if she did not return to him and repeated the threat several times in the months after she moved out. Barbara's close friend testified that Trottie called Barbara "constantly" at home and at work, begging her to come back to him. Trottie hit Barbara, bumped Barbara's car with his own while it was traveling at sixty to sixty-five miles per hour, and once kidnaped her, releasing her only after she promised to reunite with him.

Barbara obtained a protective order against Trottie in March 1993. Nevertheless, state witnesses testified that Trottie telephoned Barbara in April and told her that she had until May 1, 1993 to return to him, or else he would kill her. On May 3, 1993, Trottie called Barbara again and told her that "he wasn't going to wait around anymore" and again threatened to kill her. One witness testified that Trottie also threatened Barbara's brother Titus Canada because, according to Trottie, he had gotten "in the way."

Trottie arrived at the Canada residence at approximately 11:00 p.m. on the night of May 3, 1993, armed with a semiautomatic 9mm pistol.[1] At the time,

---

[1] Trottie had visited Barbara's house earlier that day, armed with a shotgun. Barbara's brother Titus confronted Trottie with a .380 pistol, at which point Trottie departed. Before he returned at 11:00 p.m., Trottie called Barbara's home and said that he "wanted" Barbara and her brother.

No. 11-70028

there were five children under the age of seven in the house, along with numerous other family members. According to state witnesses, Trottie opened fire immediately, wounding Barbara's mother, sister, and brother. Barbara's brother returned fire with a .380 caliber pistol and shot Trottie numerous times. Though wounded, Trottie cornered Barbara in a bedroom and, while she lay on the ground, shot her eleven times, saying "Bitch, I told you I was going to kill you." Trottie then returned to the area where Barbara's brother was lying wounded and, in the view of at least two small children, fired two shots into the back of Barbara's brother's head, killing him. Trottie left the Canada home and was arrested a short time later in the emergency room of a nearby hospital.

## PROCEDURAL BACKGROUND

The state charged Trottie with the capital murders of Barbara and Titus Canada, and the case went to trial in 1993. The state presented the above-described witness testimony at the guilt/innocence phase of the trial, as well as photographic evidence, testimony by a crime scene investigator, a medical examiner, and a weapons expert. Trottie did not testify, and his counsel did not make a self-defense argument. Rather, Trottie's counsel sought conviction for a lesser-included offense. After hearing the evidence, the jury found Trottie guilty of capital murder.

The case proceeded to the punishment phase. The district court summarized the testimony presented:

> During the penalty phase, the State presented evidence that in 1988, Trottie pled guilty in Louisiana to theft of property valued at less than $100. In July 1990, he was arrested in Texas for unlawfully carrying a weapon. He pled guilty to that crime, as well. In September 1990, Trottie was convicted of theft in Texas and placed on probation. He violated a condition of the probation in February 1993. In October 1992, Trottie shot out the tires on

3

No. 11-70028

Barbara Canada's car. . . .

Van Curry testified that he worked with Trottie for six years through the Young Professionals of Houston program. Trottie got work as a security guard through the organization and, in exchange, did volunteer work for the organization. Curry testified that Trottie worked with children through the program and they had a good experience. Trottie had a positive attitude and Curry was impressed with Trottie's leadership.

Trottie's mother and sister testified about Trottie's childhood. They testified that Trottie's parents stopped living together when Trottie was five years old. At first, the children lived with their mother. Shortly after the parents separated, Trottie's mother took the four youngest children to a motel where their father lived and told the children to wait for their father on a motel room doorstep. The oldest of the four children was nine years old. Trottie, the second oldest, was eight. After waiting for about 10 minutes, the children went to a grocery store because they were hungry. Store employees caught them stealing food, but then gave the food to them. The police eventually picked the children up and they were placed in foster care. Trottie ran away from his foster homes several times to try to find his mother or grandmother. The defense also established that Trottie had no disciplinary problems in jail.

Lynn Clark, Trottie's probation officer, testified that Trottie brought his nephew to see Clark because Trottie was concerned that the nephew was becoming involved with drugs. Trottie wanted Clark to tell his nephew about the criminal justice system, and help him get help for his drug use.

Dr. Priscilla Ray testified that Trottie needed therapy and medication for depression and issues with abandonment. She also observed that Trottie might have strong reactions to rejection or abandonment by women because of his experiences in childhood. She opined that Trottie's abandonment by his mother may have played a part in his violent reaction to Barbara's rejection. During interviews, Trottie was remorseful. Dr. Ray also testified that she did not feel threatened by Trottie, and opined that he could become a productive member of society with treatment for depression.

*Trottie v. Thaler*, No. 4:09-CV-0435, 2011 WL 4591975, *1–2 (S.D. Tex. Sept. 30,

No. 11-70028

2011). Based on this evidence, the jury found that there was a probability that Trottie would commit future acts of criminal violence constituting a continuing threat to society, and that the mitigating evidence was insufficient to warrant a life sentence. Accordingly, the trial court sentenced Trottie to death.

The Texas Court of Criminal Appeals affirmed Trottie's conviction and sentence. *Trottie v. State*, No. 71,693 (Tex. Crim. App. Sept. 20, 1995). Trottie filed a petition for writ of habeas corpus in the state court in 1997. In 2008, the trial court submitted findings of fact and conclusions of law recommending a denial of habeas relief, which the Texas Court of Criminal Appeals adopted in 2009. *Ex Parte Trottie*, No. 70,302-01 (Tex. Crim. App. Feb. 11, 2009). Trottie then sought federal habeas relief, which the district court denied in 2011. *See Trottie*, 2011 WL 4591975, at *1, 20. Trottie now seeks a COA.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Trottie's habeas petition. Under AEDPA, a state court prisoner must obtain a certificate of appealability ("COA") before he can appeal a federal district court's denial of habeas relief. 28 U.S.C. § 2253(c)(1)(A). A COA is warranted upon a "substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). A petitioner satisfies this standard if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).[2] The issue is "the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at

---

[2] In order to obtain a COA when the district court has denied relief on procedural grounds, a petitioner must show both a debatable claim on the merits *and* that the district court's procedural ruling is debatable. *See Slack*, 529 U.S. at 484–85.

342. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id.* at 336. In cases involving the death penalty, "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) (citation omitted).

We evaluate the debatability of Trottie's constitutional claims under AEDPA's highly deferential standard, which "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (citations and internal quotation marks omitted). Under AEDPA, a federal court may not grant habeas relief unless the petitioner has first exhausted state remedies with respect to the claim at issue. 28 U.S.C. § 2254(b). To prevail, a habeas petitioner must prove that the constitutional adjudication by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).[3] Clearly

---

[3] AEDPA's deferential standard applies only to claims that have been "adjudicated on the merits in State court." 28 U.S.C. § 2254(d); *see Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013). As the Supreme Court recently explained in *Williams*, when a state court has addressed some, but not all, of a defendant's federal claims, a federal habeas court must presume "that the state court adjudicated the [unaddressed] claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 133 S. Ct. at 1094 (citing *Harrington v. Richter,* 131 S. Ct. 770, 784–85 (2011)). This presumption may be rebutted, however, "either by the habeas petitioner (for the purpose of showing that the claim should be considered by the federal court *de novo*) or by the State (for the purpose of showing that the federal claim should be regarded as procedurally defaulted)." *Id.* at 1096 (citation omitted). The presumption is a "strong one," as "it is not the uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference." *Id.* at 1094.

established federal law is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state-court decision is contrary to clearly established federal law when it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413. A state-court decision fails the "unreasonable application" prong if it "identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case," *id.* at 407, or when it "extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," *id.*

That a federal habeas court would reach a different conclusion is not enough, standing alone, to merit relief under AEDPA's high standard. *See id.* at 411. As the Supreme Court recently reiterated, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786. We defer to the state trial court's factual findings, *Moody v. Quarterman*, 476 F.3d 260, 267–68 (5th Cir. 2007), and consider only the record that was before the state court, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). We review only the ultimate legal determination by the state court—not every link in its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002). In reviewing a state court habeas decision reached without explanation, "a federal court must 'determine what arguments or theories . . . could have supported the state court's

No. 11-70028

decision,' and then ask 'whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision' of the Supreme Court." *Williams v. Thaler*, 684 F.3d 597, 603 (5th Cir. 2012) (quoting *Richter*, 131 S. Ct. at 786).

## DISCUSSION

Trottie asserts three theories of habeas relief: (1) ineffective assistance of counsel, (2) *Brady* violations, and (3) prosecutorial misconduct. The district court's well-reasoned conclusions on these three theories are not debatable, and we conclude that a COA should not issue. We address each theory in turn.

## I.     Ineffective Assistance of Counsel

Trottie's ineffective assistance of counsel claims are subject to the standard set forth in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient . . . . Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687 (1984). To establish deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In evaluating deficiency, we apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Strickland's second prong "focuses on the result of counsel's deficient performance: 'When a defendant challenges a death sentence . . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of

8

aggravating and mitigating circumstances did not warrant death.'" *Roberts v. Thaler*, 681 F.3d 597, 610 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 529 (2012) (quoting *Strickland*, 466 U.S. at 695). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Prejudice exists when the likelihood of a different result is "substantial, not just conceivable." *Richter*, 131 S. Ct. at 791–92.

When an ineffective-assistance-of-counsel claim is subject to AEDPA, "the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 785. The Supreme Court has explained:

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, [529 U.S.] at 410. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* Thus, while "[s]urmounting *Strickland's* high bar is never an easy task," "establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* at 788 (citations omitted). Both the *Strickland* standard and the AEDPA standard are "highly deferential" and "when the two apply in tandem, review is 'doubly' so." *Id.* (citations omitted).

With this precedent in mind, we first turn to what Trottie calls the "heart" of his ineffective-assistance claim: trial counsel's alleged failure to investigate and present additional witnesses at the guilt/innocence and punishment phases of his trial.

No. 11-70028

## A.    Failure to Investigate and Present Additional Witnesses[4]

Particularly in the context of a capital case, defense counsel has the obligation to conduct a "reasonably substantial, independent investigation." *Neal*, 239 F.3d at 688 (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332–33 (5th Cir. 1983)).  The Supreme Court has explained the governing standard:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690–91; *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). There are no "strict rules" for counsel's conduct beyond "the general requirement of reasonableness."  *Pinholster*, 131 S. Ct. at 1406–07.  "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."  *Richter*, 131 S. Ct. at 789–90 (citing *Strickland*, 466

---

[4] The district court approached each factual basis of Trottie's ineffective-assistance-of-counsel claim separately; for example, it afforded independent consideration to: whether Trottie's counsel met with him only twice, the timing and nature of Trottie's counsel's investigation of potential witnesses, Trottie's counsel's failure to present certain witnesses at the guilt/innocence phase of trial, and Trottie's counsel's failure to present additional mitigation witnesses. Trottie complains that this approach "splinter[s]" his habeas claim "out of existence."  Without expressing any opinion on the validity of his argument, we address most of the factual allegations at issue in the course of a single analysis.  Ultimately, whether considered together or separately, none of the bases for Trottie's ineffective-assistance-of-counsel claim is sufficient to support habeas relief.

U.S. at 691).    Trial counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.    Moreover, "a defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Druery v. Thaler*, 647 F.3d 535, 541 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1550 (2012) (quoting *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993)).

Upon a reasonable investigation, defense counsel also has an obligation to make reasonable strategic decisions regarding which witnesses and evidence he will present.    *Cf. Strickland*, 466 U.S. at 690–91.    "[T]he failure to present a particular line of argument or evidence is presumed to have been the result of strategic choice."    *Taylor v. Maggio*, 727 F.2d 341, 347 (5th Cir. 1984).    As we have held, "a tactical decision not to pursue and present potential mitigating evidence on the grounds that it is double-edged in nature is objectively reasonable, and therefore does not amount to deficient performance." *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997).

Trottie bases his primary ineffective-assistance-of-counsel claim on his trial counsel's failure to both investigate and present additional witnesses. We address these issues in tandem below, as they depend on a nearly identical analysis here.

### 1.    Deficiency

In his state-court petition, Trottie argued that his trial counsel "ignored" "obvious and available" defenses—most importantly, self-defense—and failed to present "important, competent, and available evidence" of mitigation.    This is, Trottie now emphasizes, a function of his trial counsel's inadequate investigation

11

No. 11-70028

of the case and preparation for trial.  According to an affidavit that Trottie submitted to the state court, he met with Connie Williams, his lead counsel, only twice before the day of trial, for less than an hour total.  Trottie met with a private investigator obtained by his counsel, but contends that "very little was discussed."  And Trottie says that, although he provided Williams with the names of numerous potential witnesses, Williams failed to contact and interview them.  The witnesses that Williams did contact and ultimately call to testify, he allegedly failed to prepare.  An affidavit by Trottie's sister, submitted to the state court, indicates that she "did not know what [she] would be testifying to or what phase of the trial [she] would be needed for."  It further states: "I wanted to offer more relevant information on behalf of my brother as [far] as mitigation, and his character . . .  However, I wasn't asked about these topics."

Williams tells a different story.  His affidavit, also submitted in the course of the state habeas proceeding, indicates that he: "prepared and filed pre-trial motions; interviewed witnesses; obtained discovery from the State; reviewed the State's file; researched the applicable law concerning Trottie's case; and, talked with Trottie numerous times about the offense, the pending trial, and potential defense witnesses."  Williams hired a private investigator, who purportedly interviewed Trottie's parents and thirteen other potential witnesses, and a psychiatrist, who testified on Trottie's behalf after performing a psychological examination.

Ultimately, the scope of Williams's investigation and preparation for trial boils down to a credibility dispute, one the state court resolved against Trottie.  It found Williams's affidavit "credible," and relied on it extensively in rejecting Trottie's habeas claim.  The state court credited Williams with numerous strategic decisions, including the decision not to call certain witnesses and not

12

No. 11-70028

to present a self-defense argument.[5]  We must defer to the state court's factual findings, and deny relief "if there is *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788 (emphasis added).  As the district court noted, there is sufficient record evidence here to support the state court's conclusion that Williams's investigation and preparation for trial was not deficient.[6]  Because reasonable jurists would not debate the district court's view, a COA is not warranted.

---

[5] Williams explained his view of the case in an affidavit submitted to the state court:

I did not consider this a case of self-defense.  It was hard for me to argue self-defense when the State had evidence that Trottie harassed Barbara Canada to the point that she felt compelled to obtain a protective order; that Trottie told Barbara Canada and her family members and/or friends that he would kill Barbara Canada if she did not return to him by a certain date; and, that, on the night of the offense, Trottie forced his way into the Canada residence, dressed in black, and carrying a .9mm pistol.  Instead, I opted to concentrate on arguing that Trottie should be convicted of a lesser offense of murder or voluntary manslaughter.

[6] In addition to rejecting Trottie's failure-to-investigate claim on the merits, the district court also held that it was unexhausted.  We disagree.  As counsel for the state acknowledged at oral argument, the proposed findings of fact and conclusions of law that Trottie submitted to the state court dedicated three pages to the standard governing such claims.  Trottie specifically asserted that "counsel's failure to interview possible mitigation witnesses, failure to prepare those witnesses to testify at trial at the punishment stage, and failure to call those witnesses at the punishment stage of the trial could form the basis for an ineffective assistance of counsel claim now within the framework of the *Strickland* standard."  Thus, we conclude that the failure-to-investigate claim was "fairly presented" to the state court.  *Ries v. Quarterman*, 522 F.3d 517, 523 (5th Cir. 2008) ("To satisfy the exhaustion requirement, the petitioner must fairly present the substance of his federal habeas claim to the highest state court," but "[t]he habeas applicant need not spell out each syllable of the claim before the state court to satisfy the exhaustion requirement." (citations omitted)).  Because there remains no debate regarding the district court's conclusion on the merits, however, this exhaustion issue is not COA-worthy.  A habeas petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).

13

No. 11-70028

## 2.    Prejudice

Even if Williams's failure to investigate and present the additional witnesses had been deficient, the state court determined that Trottie could not show prejudice: the purportedly missing testimony was either insufficiently described, cumulative, or strategically omitted by Trottie's counsel.  Because we conclude that there is no debate that the state court's decision was reasonable, a COA is not warranted for this additional reason.[7]

Trottie submitted seven affidavits in the course of his state habeas proceeding: four alongside his initial petition in 1997 and three alongside his proposed findings of fact and conclusions of law in 2008.  The 1997 affidavits consisted of testimony by: Jim L. Peacock, Trottie's attorney at the time[8]; Theotis Holmes and Tonya Baul, potential character witnesses who were subpoenaed but never testified; and George Uthe, a private investigator with information

---

[7] Trottie asserts that the state habeas court applied the wrong standard of review (specifically, preponderance-of-the-evidence rather than reasonable probability) to the prejudice prong of his ineffective-assistance claim, such that *de novo* review is appropriate. Careful review of the state court's findings of fact and conclusions of law, however, suggests otherwise.  The state court specifically cited *Strickland* as the governing standard.  While the state court indicated that Trottie must prove deficiency by a preponderance of the evidence, it did *not* expressly apply that standard to the prejudice prong.  Thus, Trottie fails to demonstrate that the standard applied by the state court was contrary to, or an unreasonable application of, established federal law.  *See Holland v. Jackson*, 542 U.S. 649, 655 (2004) (concluding that a state court's use of the term "probable" in describing the petitioner's burden under *Strickland*, as opposed to the correct standard of "a reasonable probability," did not render the decision "contrary to" federal law where the state court previously recited the correct *Strickland* standard (citing *Woodford v. Visciotti*, 537 U.S. 19, 23–24 (2002))).

[8] Peacock's affidavit relates largely to Trottie's counsel's alleged failure to advise Trottie of his right to testify; in general terms, it states Trottie's contention that his "trial counsel did not present several available witnesses during the punishment phase of his trial and that there were others of whom his trial counsel was aware, that should have been called to testify." The affidavit names only Holmes, Baul, and Espree as potential witnesses, and offers no information regarding the substance of the missing testimony.

regarding statements by Patrice Espree, another potential witness who was subpoenaed but never testified.  The affidavits of Holmes, Baul, and Uthe all included similar language indicating that the potential witness possessed information regarding whether Trottie was a continuing threat to society, Trottie's emotional and mental state at the time of the incident (which "impair[ed] his ability to rationally handle the situation"), and the "events leading up to Mr. Trottie's arrival at Barbara Canada's home on May 3, 1993[,] which would have shown the immense strain on the relationship between Mr. Trottie and the decedents at the time . . . ."  The 2008 affidavits consisted of testimony by: Trottie himself regarding what he would have said had he been called to the stand[9] and a list of uncalled witnesses with relevant information[10]; Trottie's father, who wished to testify regarding his son's relationship with Barbara and good character;  and Trottie's sister, who testified but wanted to

---

[9] Although Trottie raised the claim in state court, Trottie no longer seeks habeas relief based on his counsel's failure to call him as a witness.  We note that the state court expressly found Williams's testimony that he "thoroughly discussed [Trottie's] right to testify during the instant capital murder trial," and "advised the applicant that he had the final choice on whether he would testify at trial" to be credible.  We have held that "when the record is simply that the defendant knew of his right to testify and wanted to do so but counsel was opposed, defendant acquiesced in his lawyer's advice, and therefore the only inquiry is whether that advice was sound trial strategy." *United States v. Mullins*, 315 F.3d 449, 453–54 (5th Cir. 2002).  Here, the state rightly points out that, had Trottie taken the stand, "he would have been cross-examined at length and forced to explain, among other issues, why he stalked and threatened to kill Barbara; why he set a deadline for her to come back to him; why he informed his probation officer he wanted to kill Barbara; why he stormed into Barbara's home with a weapon and shot her over and over again; why he shot Titus in the back of the head; and why he appeared to be 'flip' and 'casual' following the crime."

[10] At oral argument, Trottie's counsel argued that the state habeas court failed to consider Trottie's affidavit. But Trottie submitted his affidavit to the state habeas court before it reached its findings of fact and conclusions of law and nothing in the record suggests that the state habeas court ignored it.  To the contrary, the state habeas court specifically referenced Trottie's affidavit in rejecting his ineffective-assistance claim based on his counsel's failure to call him as a witness.

offer additional testimony regarding her brother's childhood, relationship with Barbara, and good character.

The state court found each of these affidavits "unpersuasive." In reaching its conclusion, the state court explained that: (1) the affidavits offered insufficient detail regarding the specific testimony that would have been elicited at trial; (2) Trottie failed to show that they were not cumulative of testimony already elicited at trial; and (3) the potential witnesses could not testify regarding the instant offense or the applicant's potential defenses because they were not present at the time of the incident.[11] In addition, the state court specifically noted that defense counsel made the strategic decision not to call certain witnesses, namely Holmes, Baul, and Espree, based on his assessment that their testimony would not benefit the defense. On this basis, the state court reasonably rejected Trottie's ineffective-assistance claim.

Trottie contends that two specific categories of evidence would have made a difference in his case. First, with respect to the guilt/innocence phase of the trial, Trottie argues that Williams failed to present evidence that would have undermined the jury's conclusion that he premeditated the murders of Barbara and her brother. For example, Trottie argues that many of the above-listed witnesses would have testified that he and Barbara had an ongoing romantic relationship, and that they continued to communicate even after Barbara obtained a protective order against Trottie.[12] Trottie further argues that the

---

[11] The state court characterized Uthe's affidavit regarding Espee's potential testimony as hearsay and, therefore, unpersuasive and suspect.

[12] In addition to rejecting this factual basis for Trottie's claim on the merits, the district court held that it was unexhausted. But Trottie presented some evidence to the state court in support of this factual claim. For example, his own affidavit indicated that, if called,

No. 11-70028

testimony would have established that Barbara's brother shot at him first, which supports a theory of self-defense.

With regard to Trottie's relationship with Barbara, the district court summarized the state court's findings as follows:

> The state habeas court found that counsel elicited testimony on cross-examination of several of the State's witnesses regarding Trottie's relationship with Barbara, his emotional and mental status at the time of the offense, and the events leading up to the murders. Specifically, Latrale Lott testified that Barbara met Trottie "a couple of times" after obtaining a protective order against him. Tyshan Baisey also testified that Barbara saw Trottie several times after obtaining the protective order.
>
> In closing argument, counsel pointed to evidence that Trottie begged Barbara to stay with him, and emphasized the evidence that Barbara continued to see him even after obtaining the protective order. Thus, the witnesses that Trottie now claims counsel should have called would have been cumulative of evidence in the record. "[A]ny ineffective assistance claim must falter where the evidence to be discovered is so similar and cumulative that failure to find and present it would not prejudice the result." *Skinner v. Quarterman*, 528 F.3d 336, 345 n.11 (5th Cir. 2008).

*Trottie*, 2011 WL 4591975, at *11 (internal citations omitted).[13]

Patrice Espree would have testified that "she witnessed the victim visiting me at my residence only days before the alleged crime. She could have proven that Barbara Canada was not afraid of me and that we maintained an ongoing romantic relationship." He further stated, "[t]he other witnesses, whose names and contact information I provided to Mr. Williams, would have corroborated that Barbara Canada and I were still in an ongoing relationship after the protective order was imposed and days before the incident occurred." Thus, reviewing only the affidavits presented to the state court, we conclude that Trottie exhausted this factual allegation. Again, however, because there remains no debate regarding the district court's conclusion on the merits, the scope of Trottie's exhaustion is not a COA-worthy issue.

[13] At oral argument, Trottie's counsel stressed that the record evidence was insufficient to demonstrate the *romantic* nature of Barbara's meetings with Trottie. According to counsel, the evidence made it appear as if Barbara saw Trottie only out of fear, when in reality the two maintained a voluntary, ongoing, romantic relationship. While the evidence may not have

17

No. 11-70028

Likewise, with respect to whether Barbara's brother, not Trottie, fired the first shot, the district court stated:

> On cross-examination of one of the investigating police officers, counsel elicited testimony that two bullets found in the door frame inside the house were fired from straight ahead, and that this was consistent with someone within the house shooting at a person entering through the door. In closing argument, defense counsel specifically argued that Titus shot first and that Trottie merely returned fire. None of this changes the evidence that Trottie threatened to kill Barbara, entered her house while armed, and murdered Barbara and Titus. The evidence is clear that, even if Trottie's first shots were fired at Titus in self-defense, he then chased Barbara into another room and shot her 11 times before returning to fire the fatal shots at Titus. This evidence does not help Trottie.

*Id.* at *14.[14] Thus, the district court determined that the "witnesses that Trottie now claims counsel should have called [at the guilt/innocence phase of the trial] would have been cumulative of the evidence in the record." Our review of the record confirms that reasonable jurists would not debate this conclusion.

Second, Trottie argues that his counsel should have investigated and

been crystal clear regarding the nature of Barbara's post-protective-order meetings with Trottie, there was at least enough evidence in the record for the jury to *infer* that the contact was, at times, consensual. As Trottie's counsel argued in closing: "[w]e know that Barbara . . . chose to not follow that protective order"; "she came to him on many occasions"; "[Trottie] was almost invited to [disobey the protective order] by the frequent contact that you heard the witnesses testify to." But even assuming that counsel's gloss on the record is true, it is unclear how the existence of some continued romantic contact would, in reasonable probability, have undermined the outcome of Trottie's trial, especially in light of Trottie's repeated threats and, ultimately, brutal attack on Barbara.

[14] In evaluating Trottie's claim, the state court also noted that Trottie's counsel elicited testimony on cross examination that: Trottie fired shots in the air when he first entered the Canada residence, that Trottie was shot six times, that Trottie may have appeared "cool and laid back" during the offense because he was "in shock from his wounds," and that Barbara hit Trottie with a stick before he shot her.

18

presented additional mitigation evidence at the punishment phase of the trial. Specifically, Trottie asserts that numerous witnesses would have testified to the "horrors that [he] experienced as a child." Trottie's state habeas filings, however, offer no detail regarding the purportedly missing testimony. Although Trottie attempted to address this problem in his federal habeas petition, filing new affidavits from several relatives, *Pinholster* forecloses our review of that evidence. *See Pinholster*, 131 S. Ct. at 1398.[15]

We note that Trottie's counsel did present some evidence regarding Trottie's difficult childhood at the sentencing phase of the trial. This testimony included a description of Trottie's abandonment at a motel doorstep, placement in foster care, abuse while in foster care, and repeated attempts to run away to find his mother or grandmother.[16] In addition, the psychiatrist that examined

---

[15] Trottie's federal habeas petition includes a number of exhibits that Trottie did not tender to the state court. Trottie argues that, despite *Pinholster's* holding that we are to review *only* the record before the state court, we should consider the new evidence here. *See id.* None of Trottie's arguments persuade us to depart from *Pinholster's* clear limitation on our evidentiary review. Moreover, in light of *Pinholster*, we reject Trottie's argument that he is entitled to a hearing to develop further evidence. Although we discuss the new evidence Trottie presented in certain portions of the opinion below, we do so only in the course of evaluating the district court's alternative holdings that the new evidence is insufficient to support habeas relief on the merits.

[16] The district court noted that the affidavits filed in the federal habeas petition—which discuss Trottie's purported physical abuse and mistreatment by his mother—contradict Trottie's own statements to the psychiatrist who testified on his behalf. It explained:

The psychiatrist noted that Trottie spoke of abandonment by his mother, but denied suffering any physical abuse, contrary to the statements in the affidavits by his relatives. [Trottie] acknowledged receiving some corporal punishment as a child, but stated that he deserved it and did not characterize it as abusive. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless . . . , counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. In this case, counsel presented evidence of Trottie's abandonment by his mother, but Trottie specifically denied that he suffered physical abuse at

No. 11-70028

Trottie prior to trial testified that Trottie's abandonment by his mother may have played a part in his violent reaction to Barbara's rejection. She said: "I think the issue of his abandonment and rejection by a woman in his very early life, his mother, predisposed him to be sensitized to that issue such that he might do well in situations where that wasn't a factor but he may react very strongly to times of being rejected, abandoned again . . . ." Thus, although the jury may not have had all of the facts that Trottie now wishes it had, Trottie's counsel did offer meaningful information regarding Trottie's childhood and how it may have impacted Trottie's decisions on the day of the incident.

In short, the district court concluded that Trottie was not entitled to habeas relief based on Williams's purported failure to investigate and present additional witnesses. Having reviewed the affidavits and trial court record, and considering the deference owed to the state court, there is no debate that the state court's decision was reasonable. Thus, a COA is not warranted with regard to this claim.

## B.    Additional Grounds for Trottie's Ineffective-Assistance Claims

### 1.    Failure to Provide Guidance in Psychological Evaluations

In his federal habeas petition, Trottie asserts that his counsel failed to provide him with any guidance regarding his competency and sanity evaluations; according to Trottie, "[c]ounsel's deficiency in this regard was disastrous . . . the State used Trottie's statements to develop its preemptive counter-theory of planning and premeditation." Trottie, however, failed to raise this issue in the state habeas proceedings. Thus, we agree with the district court that this

---

her hands. Counsel therefore had no reason to pursue any investigation into physical abuse, and was not deficient for failing to do so.

*Trottie*, 2011 WL 4591975, at *11.

factual basis for Trottie's ineffective-assistance claim is unexhausted and procedurally defaulted.  Moreover, even if Trottie had exhausted the claim, the district court concluded that Trottie could not show prejudice, as "[n]othing in the record supports Trottie's speculative claim that statements he made during the evaluations led to the State's theory of the case." *Trottie*, 2011 WL 4591975, at *10.  Because reasonable jurists would not debate the district court's decision on either ground, a COA is not warranted on this issue.

### 2.    Failure to Rebut Extraneous Offense Evidence

The state relied on evidence of two prior uncharged offenses to demonstrate Trottie's future dangerousness.  Specifically, it presented evidence that Trottie: (1) was involved in a shootout with another man in 1990 and (2) pulled a gun on a man named Frederick Rusk, the father of Barbara's daughter, while in front of the Canada house.  Trottie's state habeas affidavit is silent with respect to the second incident, and it is therefore unexhausted and procedurally defaulted.[17]  Regarding the alleged "shootout," Trottie's state habeas petition focused on his counsel's failure to properly *object* to this evidence, not his failure to rebut it.  The state habeas court ultimately rejected this argument, noting that the objection would have been properly overruled if made.  In addition, the affidavit that Trottie submitted to the state court in 2008 indicated that, *had he testified*, he would have explained that "it was not evidence of a violent nature or a previous violent criminal act on [his] behalf."  Because the state court reasonably concluded that Williams's failure to call Trottie to the stand was neither deficient nor prejudicial, as discussed in footnote 9 above, this proposed

---

[17] Although the new affidavits that Trottie submitted to the federal district court address this incident, we do not consider them pursuant to *Pinholster*.  131 S. Ct. at 1398.

evidence does not merit habeas relief. Thus, there is no debate that the state court's decision was reasonable.

We note that Trottie submitted new affidavits with his federal habeas claim, which include information regarding both of the extraneous offenses. The district court concluded that the affidavits were unexhausted and foreclosed from review by *Pinholster*. *Trottie*, 2011 WL 4591975, at *6–7. We agree. In addition, the district court determined that the affidavits failed to show prejudice on the merits:

> While some of this evidence might have been favorable to Trottie, it is not enough to establish *Strickland* prejudice. The record established the extremely violent nature of Trottie's murder of Barbara and Titus, as well as a fairly extensive criminal record including several gun-related offenses. . . . Even if Trottie could have established that he shot only in response to other people firing first, there was ample evidence of past violence and ongoing disregard for the law. Under these circumstances, it is not reasonably probable that the outcome would have been different had the new evidence been presented to the jury.

*Id.* at *13. Because the district court's conclusions are not debatable, a COA is not warranted.

### 3. Failure to Address Inconsistencies in the State's Evidence

Trottie's federal habeas petition asserts that Trottie's counsel should have addressed several alleged inconsistencies in the State's case, primarily related to the details of the crime. These details include the placement of shattered glass at the front door of the Canada residence, the range from which Trottie shot Barbara's brother, and the number of shots that Trottie fired at Barbara's brother. Although Trottie's state petition asserted that Trottie's counsel should have retained ballistics and blood spatter experts to testify regarding some of these issues, Trottie did not articulate specific inconsistencies in the trial

testimony until he filed his federal habeas petition. Thus, the district court's conclusion that these arguments are unexhausted and barred by *Pinholster* is not debatable. *See Trottie*, 2011 WL 4591975, at \*6–7. Moreover, the district court carefully and correctly explained why Trottie's new evidence is insufficient to warrant habeas relief. *Id.* at \*13–14. In short, it concluded that there is no reasonable probability that the rebuttal evidence would have affected the outcome of Trottie's trial. *Id.* Reasonable jurists would not disagree with the district court on either ground.

### 4.      Failure to Address Trottie's Wardrobe

Trottie also contends that his counsel should have rebutted evidence that he wore an all-black outfit to the Canada residence, from which the state implied that he premeditated the murders of Barbara and her brother. In his state habeas proceeding, Trottie asserted that—had his counsel called him to testify—he would have said that he wore black not because he planned to harm anyone, but because he "virtually always" dressed that way. This claim fails on both *Strickland* prongs: (1) Trottie cannot, and does not seek to, demonstrate deficiency in his counsel's failure to call him to testify, *see supra* footnote 9, and (2) the state presented evidence that Trottie also wore a ski mask, which greatly undermines Trottie's ability to show prejudice. The district court's rejection of this factual basis is not debatable.[18]

---

[18] Now, in the federal proceeding, Trottie offers a somewhat different explanation for his clothing: that he arrived at the Canada residence after a shift as a security guard, where he was required to wear black. This ground is unexhausted and outside the scope of the state court evidence. *See Pinholster*, 131 S. Ct. at 1398. Moreover, as the district court noted: "A police officer testified that Trottie's clothes consisted of a black shirt, black jeans, black tennis shoes, white socks, and a black belt. The fact that Trottie wore jeans, tennis shoes, and, most significantly, a ski mask, undercuts his claim that this was a uniform." Further, "[e]ven if his clothing was his work uniform, this does not mean that he did not make a conscious decision

## C.    The Impact of the Texas Capital Murder Statute

Throughout his COA application—and particularly with respect to his *Strickland* claims—Trottie argues that the state and district courts misunderstood the Texas capital murder statute,  Texas Penal Code § 19.03(a)(6)(A) (1993).  At the time of Trottie's trial, the statute provided that a person committed a capital offense if he (a) intentionally or knowingly (b) caused the deaths of (c) two or more individuals (d) during a single criminal transaction.  *See Trottie v. State*, No. 71,693 (Tex. Crim. App. Sept. 20, 1995).

Trottie contends that the proposed witness testimony would have cast reasonable doubt on whether he intended to murder *both* Barbara and her brother following planning and premeditation.  According to Trottie, "the uncalled witness testimony, considered together with inconsistencies among witness testimony and forensic evidence at trial, contravenes the State's theory of planning and premeditation."  Rather, "it establishes the ongoing, romantic nature of Barbara's relationship with Trottie and serves to confirm the alternate theory that Barbara's brother fired the first shot rather than Trottie."  This amounts to either a sufficiency- of-the-evidence argument or an actual innocence claim, neither of which Trottie clearly articulates.  In any event, the state appellate court rejected this argument in the course of Trottie's direct appeal. *Id.* at 3–4. It stated:

> Utilizing the required standard of review, we conclude that a jury could rationally find beyond a reasonable doubt that [Trottie] intentionally or knowingly killed his victims based on (1) his threats to kill, (2) the deadly manner in which he handled his gun at the time of the offense, (3) the short distance from which he fired his

to wear dark clothing when he went to Barbara's house." *Trottie*, 2011 WL 4591975, at *13. As with Trottie's first explanation, the district court's conclusion is not debatable.

No. 11-70028

gun, (4) the nature of the wounds he inflicted, (5) the number of wounds he inflicted, and (6) his flight from the scene.

*Id.* The state appellate court further concluded that the evidence "did not raise the possibility that [Trottie] killed his victims out of sudden passion arising from adequate cause." *Id.* at 4. With this reasonable conclusion in mind, Trottie's argument regarding the Texas capital murder statute is unavailing.

To summarize, the district court carefully considered every factual and legal basis for Trottie's ineffective-assistance claim, and determined that it either (1) was unexhausted and procedurally defaulted, (2) was reasonably rejected by the state court, or (3) failed on the merits.[19] Because reasonable jurists would not debate the district court's conclusions, we will not grant a COA on any of Trottie's *Strickland* claims.

## II.    Alleged *Brady* Violations

In addition to his ineffective-assistance-of-counsel claims, Trottie contends that the State suppressed favorable statements it obtained in investigating Trottie's case. To establish a *Brady* violation, Trottie must prove that (1) the prosecution actually suppressed the statements, (2) the statements were favorable to Trottie, and (3) the statements were material. *United States v. Brown*, 650 F.3d 581, 587–88 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1969 (2012) (citations omitted). Suppression exists only where a defendant did not—and could not—know about the essential facts that would enable him to take

---

[19] Trottie's federal habeas petition also asserted an ineffective-assistance claim based on his counsel's failure to challenge certain jurors who were predisposed toward returning a death sentence. Trottie does not pursue this claim on appeal, and we deem it waived. *See Hughes v. Johnson*, 191 F.3d 607, 613 (5th Cir. 1999) ("Issues not raised in the brief filed in support of [the petitioner's] COA application are waived." (citing *Moawad v. Anderson*, 143 F.3d 942, 945 n.1 (5th Cir.1998))).

advantage of the evidence. *Id.* at 588 (citations omitted). Thus, a defendant cannot succeed on a *Brady* claim if he could have discovered the evidence through reasonable due diligence. *Id.* (citations omitted). Materiality exists if there is "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). As with the prejudice standard that governs ineffective-assistance-of-counsel claims, the "likelihood of a different result must be substantial, not just conceivable." *Id.* (quoting *Richter*, 131 S. Ct. at 792). A "reasonable probability" is less than "'more likely than not,'" but the difference "is slight and matters 'only in the rarest case.'" *Id.*

Trottie claims that the state prosecutor violated *Brady* when he failed to disclose Trottie's former probation officer's statement that Barbara "probably did mess with [Trottie's] head a little."[20] As the district court noted, Trottie raised this claim for the first time in his federal habeas petition. According to Trottie, this is because he first learned about this evidence when the Houston County District Attorney's Office turned over its work product in the course of his federal habeas proceeding.

The district court rejected Trottie's *Brady* claim on two grounds. First, it held that Trottie failed to demonstrate suppression: "Trottie makes no showing that appellate or state habeas counsel ever sought the State's file. There is therefore no reason to believe that this information was not readily available to Trottie throughout his legal proceedings, no evidence of suppression, and no cause for his procedural default." *Trottie*, 2011 WL 4591975, at *15. We agree.

---

[20] Trottie raised additional grounds for his *Brady* claim in his federal habeas petition, but does not pursue them in his application for COA. Thus, they are waived. *See Hughes*, 191 at 613.

In fact, a November 15, 1993 note in the prosecutor's file states: "Connie Williams & Elizabeth spent several afternoons looking at the file. Kate Dolan also always had the file open to the defense." Likewise, Williams's affidavit, submitted to the state habeas court, indicates that he "obtained discovery from the State" and "reviewed the State's file." Although Trottie speculates that the note at issue was not contained within the file when Williams reviewed it, he offers no evidence on this point. Thus, Trottie cannot meet his burden to show suppression. *See United States v. Edwards*, 442 F.3d 258, 267 n.9 (5th Cir. 2006) (explaining that the party alleging a *Brady* violation bears the burden of establishing all three prongs of the *Brady* test (citation omitted)); *see also Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004) (declining to issue a COA regarding a *Brady* claim that depended upon a "substantial degree of speculation"); *Hughes*, 191 F.3d at 629–30 (holding that speculation of suppression is insufficient to establish a *Brady* claim).

Even assuming that the State failed to disclose the note, the district court rightly concluded that Trottie could not show materiality, stating that "[o]ther witnesses testified about Trottie's relationship with Barbara" and calling the purportedly suppressed evidence "at best, cumulative." *See Trottie*, 2011 WL 4591975, at *16. This conclusion is not debatable, especially in light of defense counsel's closing arguments at the guilt/innocence phase of Trottie's trial. Williams emphasized that Barbara willingly continued her relationship with Trottie, even after obtaining a protective order against him: "[w]e know that Barbara . . . chose to not follow that protective order"; "she came to him on many occasions"; "[Trottie] was almost invited to [disobey the protective order] by the frequent contact that you heard the witnesses testify to." Thus, whether or not

the State disclosed the note, there is no reasonable dispute that the defense—and the jury—knew about Trottie's back-and-forth relationship with Barbara. There is no debate that Trottie fails to demonstrate a reasonable probability that, had the statement been disclosed to the defense, the result of the proceeding would have been different. Accordingly, Trottie is not entitled to a COA regarding his *Brady* claim.[21]

### III.   Prosecutorial Misconduct

Finally, Trottie argues that the state prosecutor's misconduct— specifically, his repeated reference to certain tape recordings after they were excluded from evidence—infected his trial.[22]   We analyze prosecutorial-misconduct claims in two steps. *United States v. Ebron*, 683 F.3d 105, 140 (5th Cir. 2012) (citation omitted). First, we evaluate whether the prosecutor made an improper remark. *United States v. Fields*, 483 F.3d 313, 358 (5th Cir. 2007) (citation omitted). If so, then we determine whether the defendant suffered prejudice. *Id.* (citation omitted). "The prejudice step of the inquiry sets a high bar: 'Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected.'" *Ebron*, 683 F.3d at 140

---

[21] Trottie seeks a stay pending exhaustion of his *Brady* claim. Because we find that reasonable jurists would not disagree with the district court's rejection of Trottie's *Brady* claim on the merits, Trottie's request fails. Under Section 2254(b)(2), a habeas petition "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *See Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) ("As noted, under § 2254(b)(2) we can *deny* (but *not* grant) [petitioner's] non-exhausted claim. Because we hold [petitioner] is not entitled to habeas relief on the *Brady*-claim, we need not decide whether the district court erred in considering it.").

[22] Trottie raised additional grounds for his prosecutorial-misconduct claim in his federal habeas petition, but does not press them here. Accordingly, we deem those grounds waived. *Hughes*, 191 F.3d at 613. Moreover, because reasonable jurists would not debate the district court's disposition of those grounds, a COA is not warranted in any event.

(quoting *United States v. Holmes*, 406 F.3d 337, 355–56 (5th Cir. 2005)). Thus, a criminal conviction should not be "lightly overturned on the basis of a prosecutor's comments standing alone." *Id.* Rather, "the determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Id.* In deciding whether serious doubt infects the verdict, we look to three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Id.* (quoting *United States v. Mares*, 402 F.3d 511, 515 (5th Cir. 2005)) (internal quotation marks omitted). We generally review occurrences of prosecutorial misconduct individually, but there "may be instances where improper statements, which are not individually prejudicial enough to require reversal, could cumulate to affect the defendant's substantial rights." *Fields*, 483 F.3d at 358 (quoting *United States v. Wicker*, 933 F.2d 284, 292 (5th Cir. 1991)). Such instances, however, "are rare." *Id.* (quoting *Wicker*, 933 F.2d at 292). "To warrant a new trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *United States v. Jimenez*, 509 F.3d 682, 691–92 (5th Cir. 2007) (quoting *United States v. Wyly*, 193 F.3d 289, 299 (5th Cir. 1999)).

Because this case is subject to AEDPA, our prosecutorial-misconduct analysis is subject not only to the "high bar" discussed above, but also to the deference that we afford to the state habeas court's decision. *Cf. Richter*, 131 S. Ct. at 786–87. Trottie is not entitled to habeas relief unless the state court's decision was contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(b). Thus, we ask not whether the state court reached the correct decision, but rather a reasonable one. *Richter*, 131 S. Ct. at

785 (explaining that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law" (citation omitted)).

At issue here is the state's reference to certain tape-recordings that the trial court deemed inadmissible. The recordings captured phone conversations between Trottie and Barbara, in which Trottie purportedly threatened her. The trial court held a hearing outside of the presence of the jury to determine the admissibility of the tape recordings and, at the conclusion of the hearing, sustained Trottie's objection. Later, *in the presence of the jury*, the state again attempted to introduce the tapes. Defense counsel objected, stating: "It's my understanding the Court already ruled on the tapes." After some discussion at the bench, the trial court advised the prosecutor to "stay away" from the subject of the tapes and "go on to something else." Very shortly thereafter, the prosecutor asked the same witness yet another question about the tapes ("[w]as any of that stuff tape recorded?"). Trottie's defense counsel objected and moved for a mistrial. The court denied the motion for a mistrial, but instructed the jury to "disregard the last question and do not consider it for any purpose whatsoever."

The jury sent two notes regarding the tapes in the course of its guilt/innocence deliberations. The first note sought numerous pieces of evidence, much of which had been admitted into evidence, including "pictures, tapes, [and an] autopsy report." In an itemized list, the jury specifically requested "cassette tapes." The jury's second note sought exclusively the "tape recordings of threats," along with a tape recorder. The court responded: "not in evidence." Trottie relies on these notes to illustrate the importance of the cassette tapes in the minds of the jurors.

Despite the court's response to the jurors' second note, the prosecutor

mentioned the tapes *again* during the punishment phase of the trial. The following exchange occurred during cross-examination of the psychiatrist that testified on Trottie's behalf:

| | |
|---|---|
| Q: | Did Mr. Williams have you listen to the tape-recordings of conversations between — |
| MR. WILLIAMS: | Object to that. It is totally not for the jurors' consideration and is not in evidence. |
| THE COURT: | Overruled. |
| BY MR. SUTTON: | |
| Q: | Did Mr. Williams allow you to listen to tape-recordings between – conversations between Mr. Trottie and Barbara Canada? |
| A: | No. |
| Q: | Did he ever mention those recordings to you? |
| A: | I believe he mentioned that there were recordings but I didn't know of what. |
| Q: | Would it surprise you that we had hours of tape-recordings of conversations between the defendant and – |
| MR. WILLIAMS: | Objection, Judge, referring to something not in evidence, how long it is. Ask the jury to disregard. |
| THE COURT: | Sustained. The jury will disregard. |

The court denied defense counsel's request for a mistrial.

Recognizing a litigant's duty to afford great respect to a trial court's evidentiary rulings—especially when speaking in front of a jury—we assume, *arguendo*, that the prosecutor's statements were improper. Thus, we turn to the second prong of the prosecutorial-misconduct inquiry: whether the statements substantially affected Trottie's right to a fair trial. The district court concluded that they did not:

> While the prosecutor clearly referred to, and questioned witnesses

## No. 11-70028

about, tapes ruled inadmissible, this conduct does not amount to a
due process violation. The point of the tapes presumably was to
establish that Trottie had threatened Barbara. Defense counsel
quickly objected to the improper questioning, and the trial court
gave a curative instruction. Moreover, as discussed above, there
was ample evidence that Trottie did threaten Barbara, repeatedly,
and that the murders resulted from Trottie following through on his
threats. In light of this evidence and the trial court's instructions,
the prosecutorial misconduct did not affect Trottie's substantial
rights. Accordingly, he is not entitled to relief.

*See Trottie*, 2011 WL 4591975, at *17.[23] This conclusion is not debatable. Trottie

offers no more than speculation that the court's curative instructions and its

response to the jury note were insufficient to neutralize the prosecutor's

statements. Moreover, as the district court noted, the evidence that *was*

admitted established—over and over again—that Trottie threatened Barbara's

life. Indeed, one witness's testimony included a long exchange regarding the

tapes, to which defense counsel did not object. The testimony included the

following:

Q:    Tell the jury about the tapings.
A:    On the date of the killings, he called and said that she had
      enough time and that he wasn't going to wait around anymore
      and that he was going to kill her.
Q:    Were some of those conversations recorded on cassette tapes?
A:    Yes.
. . .
Q:    From what you listened to on the phone, what you heard
      when he was actually talking and then what you later heard
      on cassette tapes, was there any difference between what you
      heard Mr. Trottie saying on the phone to what was recorded
      on the tapes?

---

[23] The district court concluded that Trottie exhausted this claim, and we agree. *See
Trottie*, 2011 WL 4591975, at *16.

A:     No.

Thus, much of the purported content of the tape recordings was cumulative of the evidence already in the record.  Accordingly, reasonable jurists would not debate the reasonableness of the state habeas court's decision, and a COA is not warranted.

## CONCLUSION

For the reasons stated above, we conclude that reasonable jurists would not debate the district court's conclusions regarding any of Trottie's *Strickland*, *Brady*, and prosecutorial-misconduct claims, and Trottie therefore makes no substantial showing of the denial of a constitutional right.  Accordingly, we DENY Trottie's COA application.