NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4446
_____

RITA SAWYER,
                                Appellant

v.

SUPERINTENDENT MUNCY SCI; ATTORNEY GENERAL
PENNSYLVANIA; DISTRICT ATTORNEY LEBANON COUNTY


_____

On Appeal from the District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 1-12-cv-01269)
District Judge: Honorable William W. Caldwell
_____

Argued:  November 21, 2014

Before: AMBRO, SCIRICA, and ROTH, <u>Circuit Judges</u>

(Filed:  August 10, 2015)

Norris E. Gelman, Esq.
2000 Market Street
Suite 2940
Philadelphia, PA  19103

        *Counsel for Appellant*

Sarah K. Hart, Esq. [ARGUED]
David J. Arnold, Jr., Esq.
Lebanon County Office of District Attorney
400 South 8th Street
Municipal Building, Room 11

Lebanon, PA 17042

> *Counsel for Appellees*

_____

**OPINION**[*]

_____

**SCIRICA**, *Circuit Judge*

Rita Sawyer appeals the denial of her petition for a writ of habeas corpus seeking relief from her first-degree murder conviction. She contends that, under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d)(1), the decision of the Pennsylvania Superior Court "was contrary to, or involved an unreasonable application of," the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). We disagree, and will affirm.

## I.

### A.

At the time of her mother's death, Sawyer, 47 and single, was an anesthesiologist struggling with depression and alcoholism. She had made plans to enter an inpatient rehabilitation program on June 21, 2004. Her mother, Mary Sawyer, lived at a nursing home nearby. At 79, Mary suffered from dementia and did not recognize Sawyer, although the two had been very close. Sawyer, among her siblings, took primary responsibility for visiting her mother.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

The night before she was to enter the inpatient rehabilitation facility, Sawyer took her mother home for an overnight visit. Sawyer had never signed Mary out before and did not inform any friends or family that she was doing so. Nurses thought Sawyer was in a hurry because she declined to take a wheelchair for her arthritic mother and accepted a bag with Mary's incontinence briefs and medications only after they urged it upon her.

The next morning, Marjorie Merchant, Sawyer's friend and the wife of Sawyer's medical partner, went to Sawyer's house and found Sawyer attempting suicide in her car with the engine running in her closed garage. Coaxing Sawyer into the fresh air outside and stalling her until a driver from the rehabilitation facility arrived, Merchant observed that Sawyer was impaired and behaving almost robotically. Merchant then found and packed a suitcase for Sawyer to take to the rehabilitation facility because Sawyer was unable to do so herself.

On the way to the rehabilitation facility, Sawyer told the driver her mother had died and was in bed at her home. Mary's body was subsequently found in the bedroom, where police also located a syringe on a nearby dresser and a pillow with Mary's saliva on the floor. The incontinence briefs were still in Sawyer's car, where police found a suicide note and a cooking pot with four emptied bottles of Sevoflurane, an inhalational anesthetic. That evening, Sawyer called her sister and said their mother had died. She added, "I don't know what I did."

Dr. Barbara Bollinger performed an autopsy the next day. She ruled the death a homicide by asphyxia and drugging based on her findings of blunt trauma to the neck (a subcutaneous bruise on the right side of Mary's larynx), petechiae (small hemorrhages) in

3

each eye, and the administration of Versed (midazolam), an anesthetic used to sedate patients before surgery.

Police then interviewed Sawyer, who admitted giving Mary a shot of brandy and possibly an injection of Versed so Mary would sleep. But she could not entirely recall, she told police, because she suffered an alcoholic blackout after she consumed the fifth of brandy. When police asked her whether she had killed her mother, she replied, "I don't think so. I don't see that I would have." Later during Sawyer's rehabilitation stay, police recovered Sawyer's diary, which contained several entries, likely written during rehabilitation. The prosecution claimed that the entries failed to show grief and instead revealed Sawyer's feelings of anger and bitterness towards her parents for having to please them and later take care of them.

**B.**

The Commonwealth charged Sawyer with first-degree murder and the unlawful administration of a controlled substance.[1] At trial, the cause of Mary's death was a central issue, and the Commonwealth's case was based on circumstantial evidence. The prosecution argued that Sawyer had suffocated her mother by smothering her with the pillow while simultaneously applying pressure on her jugular vein. Although Dr. Bollinger conceded that Mary suffered from severe arterial blockage, which "by itself could be a cause of death" (although she asserted that "in this case, it was not"), she opined that to a reasonable degree of medical certainty, "[t]he manner of death is

---

[1] Pursuant to 18 Pa. Cons. Stat. Ann §§ 2501(a) (criminal homicide) and 2502(1) (first-degree murder) and 35 Pa. Stat. Ann. § 780-113(a)(14) (unlawful administration of a controlled substance).

4

homicide." She also conceded that petechiae could appear for various reasons, such as straining at constipation, severe coughs, and other everyday occurrences; and admitted that she had never applied this exact theory to any of the cases she had seen before. But she suggested that the Versed's sedative effect might explain why Mary had no scratches on her neck (which otherwise might signify a struggle), and a supporting prosecution expert corroborated Dr. Bollinger's overall analysis by opining that the bruise deep in Mary's neck, in the absence of a mark on the skin, could have resulted from "pressure in the area [of] the thyrohyoid . . . against the tracheal cartilage," thereby causing "squeeze[ing] between the force and the cartilage."

By contrast, defense expert Dr. Michael Baden testified that to a reasonable degree of medical certainty Mary died of a fatal cardioarythmia resulting from plaque buildup in her coronary arteries that narrowed all three by 60 to 80 percent. He opined that Mary's body showed no signs of strangulation even though oxygen starvation usually results in signs of a struggle. In addition, a supporting defense expert observed without contradiction that the Versed in Mary's system was "a very small amount" that "would have very, very minimal [e]ffect and would have no [e]ffect on respiration or level of consciousness." He further noted that midazolam, in any quantity, "has never been implicated with regard to respiratory death," although Dr. Baden conceded "it is unusual to give Versed for sleep."

Notably, Dr. Baden thought the prosecution's theory was strangulation and appeared unaware that the prosecution would instead press a suffocation theory because, he explained, "suffocation does not involve blunt trauma to the neck." He conceded,

5

however, that "[s]uffocation may not show any physical manifestations."

## II.

### A.

Under Pennsylvania's *corpus delicti*[2] rule, the Commonwealth must prove beyond a reasonable doubt that the charged crime has been committed before using the defendant's inculpatory statements to connect her to the crime. *E.g.*, *Jacobs v. Horn*, 395 F.3d 92, 109 (3d Cir. 2005); *see also Commonwealth v. Verticelli*, 706 A.2d 820, 824 (Pa. 1998), *abrogated on other grounds by Commonwealth v. Taylor*, 831 A.2d 587 (Pa. 2003). "In a murder prosecution, the *corpus delicti* consists of evidence that an individual is dead and that the death resulted from criminal means." *Jacobs*, 395 F.3d at 109 (citing *Commonwealth v. Tallon*, 387 A.2d 77, 80 (Pa. 1978)). The rule applies in two steps: first, the trial judge must determine by a preponderance of the evidence that a crime has been committed. *Commonwealth v. Reyes*, 681 A.2d 724, 727-28 (Pa. 1996). The jury then must find the same beyond a reasonable doubt. Accordingly, a specific "jury instruction . . . is . . . crucial" to prevent the "dilut[ion of] the Commonwealth's burden of proof." *Commonwealth v. Ahlborn*, 657 A.2d 518, 521-22 (Pa. Super. Ct. 1995).

### B.

At Sawyer's trial, the trial judge found the prosecution had satisfied the first step of the *corpus delicti* rule and permitted it to introduce Sawyer's diary entries and her statements to her sister and the police. At closing argument, the prosecution used these

---

[2] "*Corpus delicti*" is Latin for "body of the crime." *Black's Law Dictionary* 419 (10th ed. 2014).

inculpatory statements as evidence of Sawyer's guilt. In particular, the prosecution argued that Sawyer's answer of "I don't think so" to the police's question whether she killed her mother lacked "righteous indignation" and was inconsistent with Sawyer's claim of having suffered an alcoholic blackout.

Sawyer's lawyer did not request a *corpus delicti* jury instruction and the court did not give one. Instead, the court instructed the jury that "medical testimony may be too uncertain to establish criminal causation beyond a reasonable doubt" and observed that "Sawyer alleges that against her the proof here concerned is the pathologist's findings of petechiae, a subcutaneous bruise on the right side of Mary Sawyer's larynx and administration of an unknown quantity of a sedative, Versed." It instructed, "You must decide as the finders of fact whether this evidence proves causation beyond a reasonable doubt."

On October 10, 2005, after a weeklong trial, the jury convicted Sawyer of first-degree murder and the unlawful administration of a drug. She was sentenced to life in prison.[3]

### III.

### A.

On postconviction review before the state trial court ("PCRA court"[4]), Sawyer asserted her trial counsel had been ineffective under *Strickland v. Washington*, 466 U.S.

---

[3] Sawyer received a life sentence for the first-degree murder conviction and 15 years, to run concurrently, for the unlawful administration of a drug. Super Ct. Op. 5.

[4] So-called after Pennsylvania's Post Conviction Relief Act, 42 Pa. Cons. Stat. Ann. § 9541 *et seq.*

668, in failing to request a *corpus delicti* instruction.[5] Under *Strickland*, Sawyer had to show "there [wa]s a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The PCRA court initially held Sawyer to a standard less stringent than *Strickland*'s. Despite opining that, on the strength of the evidence presented at trial,[6] "the failure to request the corpus delicti instruction was harmless error," the PCRA court found the so-called harmless error to be ineffective assistance of counsel and ordered a new trial. On appeal, the Pennsylvania Superior Court reversed and remanded for application of *Strickland*'s prejudice standard.

On remand, the PCRA court denied relief in a single-page order stating that Sawyer could not "establish there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." The Pennsylvania Superior Court affirmed because Sawyer had "not established that counsel's failure to request a *corpus delicti* instruction resulted in prejudice." Super. Ct. Op. 9.[7] In particular, the court reasoned that "the compelling evidence of Appellant's guilt leads to the conclusion that Appellant cannot establish the jury would have acquitted her had it received a specific *corpus delicti* instruction." *Id.* at 10.

---

[5] Sawyer's trial counsel filed a direct appeal, which current counsel subsequently withdrew in favor of postconviction proceedings.

[6] The PCRA judge was the same judge who presided over Sawyer's criminal trial.

[7] The Superior Court's opinion in *Commonwealth v. Sawyer*, No. 2 MDA 2010 (Pa. Super. Ct. Mar. 9, 2011), is attached to Sawyer's brief as Exhibit C. Only the disposition is reported at 26 A.3d 1185 (table).

8

## B.

Sawyer then filed the instant habeas petition in federal court. She argued, as the District Court recited, that the Pennsylvania Superior Court had erroneously evaluated her *corpus delicti*–based *Strickland* claim under a "but for" standard instead of the proper *Strickland* prejudice standard. *See Sawyer v. Drioux*, No. 12-1269, 2013 WL 5755428, at *9 (M.D. Pa. Oct. 23, 2013). Sawyer contended she needed to show only that "there was a reasonable probability that the failure to give a corpus delicti instruction undermined confidence in the outcome," not that "the jury would have acquitted her had they been given a corpus delicti instruction." *Id.*

The District Court denied Sawyer's habeas petition because she could not "show that the superior court's resolution of the corpus delicti claim was contrary to *Strickland* or an unreasonable application of *Strickland*" under AEDPA § 2254(d)(1). *Id.* The District Court noted that the Pennsylvania Superior Court had "set forth a three-prong state-law test for ineffectiveness . . . equivalent of the *Strickland* standard," and that the Superior Court's subsequent "use of 'shorthand' language in its prejudice analysis does not in itself mean that it did not follow *Strickland*." *Id.* (quoting *Woodford v. Visciotti,* 537 U.S. 19, 23-24 (2002) (per curiam)). The District Court also concluded the Superior Court had not unreasonably applied *Strickland* in "look[ing] at the instructions as a whole." *Id.* at *10. The District Court observed that the instructions "put the burden of proof on the Commonwealth to prove the elements of the crime beyond a reasonable doubt." *Id.* Further, the court noted, the Superior Court "looked to the evidence at trial and decided that the outcome would not have been different, or in *Strickland* terms, that

9

there was no reasonable probability that the result would have been different." *Id.* On its own review of the evidence, the District Court could not "conclude that this ruling was unreasonable under *Strickland*." *Id.*

## IV.[8]

Under AEDPA, federal judicial review of a state court's postconviction merits decision is limited to determining whether the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[9] Because the Pennsylvania Superior Court's decision is consistent with *Strickland* in both these respects, we will affirm the District Court's denial of Sawyer's § 2254 petition.

### A.

### 1.

---

[8] The District Court had jurisdiction under 28 U.S.C. §§ 2241(c)(3) and 2254(a). On Sawyer's timely motion, we issued a certificate of appealability to review whether the Pennsylvania Superior Court's resolution of Sawyer's claim that trial counsel was ineffective for failing to request a *corpus delicti* jury instruction "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see* 28 U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 335-38 (2003). We denied Sawyer's request for a certificate of appealability as to her *Strickland* claim based on counsel's failure to object to the trial court's jury instructions concerning voluntary intoxication because Sawyer failed to make a "substantial showing of the denial of a constitutional right" with regard to that claim. *See* 28 U.S.C. § 2253(c)(2). We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

[9] If a state court's adjudication results in a decision contrary to, or involves the unreasonable application of, Supreme Court precedent, federal review proceeds de novo. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 393-98, 406 (2000) ("[A] federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause.").

Under § 2254(d)(1) of AEDPA, "[a] state-court decision is 'contrary to' [the Supreme Court's] clearly established precedents if it 'applies a rule that contradicts the governing law set forth in [the Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent.'" *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "Avoiding these pitfalls does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [those] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.*; *see also, e.g.*, *Priester v. Vaughn*, 382 F.3d 394, 398 (3d Cir. 2004). In essence, § 2254(d)(1) "demands that state-court decisions be given the benefit of the doubt," and the Supreme Court has cautioned lower courts against any "readiness to attribute error" by failing to "presum[e] that state courts know and follow the law." *Visciotti*, 537 U.S. at 24.

**2.**

"*Strickland* held that to prove prejudice the defendant must establish a '*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different'; it specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered." *Visciotti*, 537 U.S. at 22 (emphasis in original) (quoting *Strickland*, 466 U.S. at 694). But although the Supreme Court has stated that a state court's decision will be contrary to *Strickland* if it

holds the defendant to such a preponderance of the evidence standard,[10] the Court has also set out particular guidelines for how a state court's decision must be interpreted.

In *Woodford v. Visciotti*, the Court found that the state court had "expressed and applied the proper standard for evaluating prejudice," *id.*, even though it had "used the term 'probable' without the modifier 'reasonably'" in four places, *id.* at 23. The Court observed that the state court had twice correctly set out "the 'reasonable probability' criterion, with a citation of the relevant passage in *Strickland*," *id.* at 22, as well as accurately discussed *Strickland*'s "[u]ndermin[ing] confidence" language, *id.* at 23 (second alteration in original). While the state court's "occasional shorthand reference to th[e *Strickland*] standard by use of the term 'probable' without the modifier may perhaps be imprecise, . . . it can no more be considered a repudiation of the standard than can th[e Supreme] Court's own occasional indulgence in the same imprecision." *Id.* at 23-24. And subsequently, in *Holland v. Jackson*, 542 U.S. 649 (2004) (per curiam), the Court suggested it does not consider the words "would not have" to "imply any particular standard of probability," *id.* at 654, especially "when the complete *Strickland* standard is elsewhere recited," *id.* at 655. *See also, e.g.*, *Frost v. Pryor*, 749 F.3d 1212, 1226-27 (10th Cir. 2014).

---

[10] *See Williams*, 529 U.S. at 405-06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'" (quoting, inter alia, *Strickland*, 466 U.S. at 694)).

In addition, the Supreme Court observed in *Jackson* that under § 2254(d)(1) a federal court should not "needlessly create internal inconsistency in [a state court's] opinion" when the state court's language can be "reasonably read" as consistent with Supreme Court precedent. 542 U.S. at 654 (holding that where "[t]he state court began by reciting the correct *Strickland* standard" but later used "the unadorned word 'probably,'" the state court had not incorrectly applied a preponderance standard, and declining to "needlessly create internal inconsistency in the opinion" by reading another statement to refer to prejudice when context indicated it was "reasonably read as addressing the general burden of proof in postconviction proceedings"). Together, *Visciotti* and *Jackson* clarify that the Supreme Court's command to give state courts "'the benefit of the doubt'" is a directive to presume, "absent an affirmative indication to the contrary, . . . that state courts 'know and follow the law.'" *See Bell v. Cone*, 543 U.S. 447, 455-56 (2005) (per curiam) (quoting *Visciotti*, 537 U.S. at 24)). Most relevant court of appeals decisions agree that where a reading of the state court's opinion as a whole demonstrates that the state court applied the correct legal standard (notwithstanding stray imprecise articulations), the federal habeas court is to defer to the state court's decision.[11]

---

[11] *See, e.g.*, *Frost*, 749 F.3d at 1226-27 ("[W]hen viewed in its entirety, the [state court's] proper articulation of the prejudice standard in other parts of its opinion confirms that it was not relying on an impermissible 'more likely than not' preponderance standard."); *Bledsoe v. Bruce*, 569 F.3d 1223, 1232-33 (10th Cir. 2009); *Charles v. Stephens*, 736 F.3d 380, 392-93 (5th Cir. 2013) (per curiam), *cert. denied*, 135 S. Ct. 52 (2014); *Williams v. Roper*, 695 F.3d 825, 832 (8th Cir. 2012); *Sussman v. Jenkins*, 636 F.3d 329, 359-60 (7th Cir. 2011); *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006) (reasoning that simply stating the standard incorrectly once, after stating it correctly before, is unlikely to overcome the presumption that the state court knows the law); *Ventura v. Att'y Gen.*, 419 F.3d 1269, 1284-86 (11th Cir. 2005).

**B.**

Sawyer contends the Pennsylvania Superior Court's denial of her ineffective assistance of counsel claim was contrary to *Strickland* because the court applied an unadorned but-for standard requiring her to prove by a preponderance of the evidence that she would have been acquitted, rather than require that she "only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'" *Williams*, 529 U.S. at 406 (quoting *Strickland*, 466 U.S. at 694). In particular, she points to the court's statement that she "cannot establish the jury would have acquitted her had it received a specific *corpus delicti* instruction." Super. Ct. Op. 10.

On review of the Pennsylvania Superior Court's opinion as a whole, however, we cannot find any "affirmative indication" to rebut the presumption that the court "kn[e]w and follow[ed] the law." *Cone*, 543 U.S. at 456 (quoting *Visciotti*, 537 U.S. at 24). The Superior Court twice stated *Strickland*'s ineffective assistance of counsel standard unassailably. First, in reviewing procedural history, the court stated that "[u]pon remand, the PCRA court found that, based on its review of the entire record, '[Sawyer] cannot establish there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different.'" Super. Ct. Op. 6. Second, the Superior Court stated the standard, with express reference to *Strickland*, as requiring Sawyer to show that "but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." *Id.* at 7 (quoting *Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010)). Given the presumption that state courts know and follow the law and the Pennsylvania Superior Court's correct articulation of the *Strickland* standard,

14

we are constrained to read the statement Sawyer has identified as "shorthand" under *Visciotti.*

Moreover, the absence of an adverb in the statement Sawyer points to is at best ambiguous, and without more we may not "needlessly create internal inconsistency in [an] opinion," *Jackson*, 542 U.S. at 654, that earlier articulates the standard correctly while citing *Strickland*. Reading the opinion as a whole, we note that the Pennsylvania Superior Court explicitly interpreted the jury instructions as "emphasiz[ing] that the jury must find that evidence must prove beyond a reasonable doubt that Mary's death resulted from criminal conduct and not natural causes." Super. Ct. Op. 10. In the District Court's words, the Pennsylvania Superior Court found that these instructions were "essentially corpus delicti instructions." 2013 WL 5755428, at \*10. Further, the context of the language Sawyer highlights does not support her reading. The Pennsylvania Superior Court stated, "[*T*]*he compelling evidence of* [*Sawyer's*] *guilt leads to the conclusion* that [Sawyer] cannot establish the jury would have acquitted her had it received a specific *corpus delicti* instruction," Super. Ct. Op. 10 (emphasis added), and then summarized this "compelling evidence," which was limited to evidence not subject to attack under the *corpus delicti* rule, *see id.* at 10-11. Because we understand the "fair import" of the Pennsylvania Superior Court's decision to comply with *Strickland*, we cannot overrule it under § 2254(d)(1) for want of a more precise "formulary statement." *See Packer*, 537 U.S. at 9.

## C.

Nor can Sawyer show the Pennsylvania Superior Court's application of *Strickland*

15

was unreasonable under § 2254(d)(1) of AEDPA. "[I]f there was a reasonable justification for the state court's decision," we may not disturb it. *See Richter*, 562 U.S. at 109. As we have noted, the Superior Court found the circumstantial evidence of Sawyer's guilt, outside of her inculpatory statements, "compelling."[12] Although we might not independently agree with that characterization, we cannot find unreasonable the Superior Court's determination that this circumstantial evidence was sufficient to overcome *Strickland*'s reasonable probability of a different result. *See also generally, e.g.*, *Brown v. Wenerowicz*, 663 F.3d 619, 632 (3d Cir. 2011) ("The proper question was whether fair-minded jurists could agree with the Superior Court, not whether it erred in denying relief."). The Superior Court observed that the trial court gave a criminal causation instruction referring specifically to the medical testimony, and reasoned that the jury could have "believe[d] the Commonwealth's expert testimony explaining how the autopsy and toxicology results supported its conclusion that Mary's death was a homicide." Super. Ct. Op. 10. We cannot say this conclusion, given the medical

---

[12] The Pennsylvania Superior Court identified the following evidence:

> [A]lthough she had never done so before, Appellant took Mary out for an overnight visit when she had to leave for rehabilitation early the next morning and did not tell any of her family or friends she was doing so. Appellant seemed to disregard the nurses' instructions for her mother's care and gave her elderly mother alcohol and an injection of anesthetic which she was not prescribed. Appellant delayed notifying her siblings of Mary's death, but informed her veterinarian who was scheduled to visit Appellant's home that morning to see Appellant's horse.

Super Ct. Op. 10-11. We think this evidence, even if it encompasses some of Sawyer's statements, was not covered by the *corpus delicti* rule. *See Verticelli*, 706 A.2d at 824 (noting that a statement is inculpatory if it "specifically connects [the defendant] to criminal activity," and that only material inculpatory statements, and not "all statements," "are subject to the corpus delicti rule").

16

testimony instruction and the mismatch between the prosecution's suffocation theory and Dr. Baden's strangulation defense, was unreasonable. In addition, the circumstantial evidence the Superior Court identified was probative of not only criminal causation, but also Sawyer's involvement.

Accordingly, although we find Sawyer's first-degree murder conviction to be harsh, especially in light of her impairment[13] and the surrounding circumstances, we do not believe the Superior Court's application of *Strickland* was unreasonable.

## V.

For the foregoing reasons, we will affirm the District Court's denial of Sawyer's habeas petition.

---

[13] Sawyer's mother died sometime during the early morning hours of Monday, June 21, 2004. Sawyer introduced evidence that her blood alcohol content was .380% at midnight of June 20, 2004, .272% at 6:00 a.m. on June 21, and .127% at 2:57 p.m. on June 21. *Sawyer*, 2013 WL 5755428, at *9.